and we'll turn to 20-1433, Brooklyn Center for Independence versus Metropolitan Transportation Authority. Mr. Seaborn. Good afternoon, your honors. May it please the court. Your honors, I'd like to reserve three minutes for rebuttal. That's fine. Your honors, the district court erred in four ways. First, it misapplied the ADA's program access requirements regarding the MTA's maintenance of the existing accessible features of the subway system. The court considered only whether there are specific uptime standards for elevator maintenance, rather than determining whether as a practical matter, persons with disabilities have meaningful access to the benefits of the New York City subway system. Second, as a result of that legal error, the district court ignored voluminous evidence in the record demonstrating at minimum, a genuine issue of material fact on the question of meaningful access. Third, the district court held plaintiffs to the wrong standard on defendant's summary judgment motion. It required plaintiffs to rely on undisputed facts in the record, rather than considering the facts in light most favorable to plaintiffs and recognizing that summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party. Fourth, the district court applied the wrong analysis to the New York City human rights law claim, improperly applying a restrictive standard that would make the city human rights law less protective of plaintiff's rights than federal law. Your honors, turning to the ADA and Rehab Act claims at issue, the district court failed to apply the appropriate legal analysis. Under the program access requirements of Title II of the ADA and Section 504 of the Rehab Act, entities operating public transportation must provide their programs so that when viewed in their entirety, those programs are readily accessible to and usable by people with disabilities. The relevant regulations clarify that this readily accessible standard includes maintaining accessible features at existing facilities, including elevators. And while the district court was correct that there is no particular standard for elevator uptime in the regulations, its analysis should not have stopped there. As the Seventh Circuit clarified in the Foley case, the only way to apply the regulations is to consider the unique circumstances inherent in any particular transportation service site. That approach is consistent with Henrietta Dee in this circuit, which requires the court to determine whether as a practical matter, persons with disabilities have meaningful access to the benefits of the public entities programs. Here, instead of examining the defendant's elevator maintenance and accommodations in the context of unique facts surrounding the accessibility of the New York City subway system or the inaccessibility of that system, the district court erred by relying only on the lack of specific standards for elevator uptime. In doing so, the court ignored voluminous evidence in the record, demonstrating at minimum a genuine issue of material fact on meaningful access. This evidence includes evidence demonstrating that the overall inaccessibility of the subway system results in the most utilized subway system in the country also being the least accessible. It includes a comptroller report indicating that 200,000 New Yorkers with mobility disabilities live in transit deserts that lack a single accessible subway station, thus magnifying the impact when the few accessible stations that do exist have elevator outages. Strikingly, though the court admitted three expert reports, it did not discuss them and ignored them in its order, specifically plaintiff's expert Rishel's report showing that an elevator dependent passenger would be unlikely to experience a week of commuting without encountering one or more elevator failures. It similarly ignored plaintiff's expert Schwartz, noting that a typical daily commuter relying on elevators would experience a failed trip eight to 15% of the time and a median trip failure rate of 10%. Now this is at appendix 48, the previous one was at appendix 732. And to put it into context, that's one failed trip per week for daily commuters. And the testimony of the main plaintiffs and class member declarants, not only corroborates these expert findings, but puts them in the context. So you've got somebody like plaintiff, Chris Angeline, who took a daily log of his subway trips. He had nearly 15% of his commuting trips derailed by outages. Plaintiff Blair Goldenson describes running into outages weekly and instances of not being able to pick up his children due to being stuck at a station and having to be evacuated by the fire department. Those are at respectively JA91 and JA84 to 87. You've got class member Monica Bartley describing how unplanned outages have deterred her from taking the subway for her daily commute because she could not rely on it. That's at JA108 to 109. Well, the district court saw all this evidence of the different plaintiffs who said that they had encountered these obstacles and was concerned that that sounded too anecdotal and wanted to be able to articulate the standard in a more objective way. Is there a way you could articulate the standard or is it just meaningful access under the circumstances? Well, there are a couple of points here. One is that there's far more than anecdotal evidence that the district court completely ignored. There's also- No, that's right. I get that. I wasn't saying that that was your only evidence. I understand that the statistical studies you just mentioned. So I'm not saying that that was your only evidence. I'm just reminded of a colloquy in the record where the district court says that I can't rely on anecdotal evidence and wanted the plaintiffs to articulate some operational standard for meaningful access. And I'm just curious if you have a way to articulate the kind of thing that he was looking for. Your Honor, the whole point of the meaningful access analysis and again, this is consistent with what Henrietta Dee requires in this circuit. It also, the Foley case kind of hits it right on the head in the context of elevator maintenance and the regulations. There is no one size fits all. And I just want to take the example that the defendants and the court gave of this kind of 96.5% uptime figure that they keep throwing out. So not only does it not take into account the overall inaccessibility of the subway system in New York City, you've got 25% accessibility when particularly if you look at the Kupalo case, which is one of the courts, one of the cases the court discusses at the district court level, that's 100% accessibility. So there it's skewed as it is. And then that 96.5 number fails to consider that the majority of stations require at least two elevators to navigate. So that actually, if you look at station accessibility proposed to- Right, it becomes multiplied, right? If you talk about somebody who's disabled, who's going on trips, 96% of elevators operable suddenly becomes a much higher likelihood of encountering an obstacle. I understand that. But without articulating a one size fits all standard is the idea that, you know, under the circumstances when, you know, eight to 15% of the time somebody is going to have a failed trip that is not meaningful access. Is that, I mean, I'm just asking you to- Yes, your honor. I mean, that- What did the district court should have said after he said, well, the ADA doesn't provide a clear standard. And then, you know, you should have gone on to say, but under the circumstances, this fails to meet the standard because, and it's because of all of this together or is there a key way to- Your honor, well, a couple of things. One is we're here on defendant's motion for summary judgment. So the district court should have found at least a disputed issue of material fact on whether there was a denial of meaningful access or not. It didn't, he didn't even consider all the undisputed facts. Second, there are multiple expert reports. You could, and the court's task really is to look at the unique nature of the subway system. So it could have done an analysis at trial. You look at the, you know, there are reports about what appropriate metrics could be. There's evidence in the record of the MTA. And this is, this comes from the comptroller and the MTA's own consultants. The MTA did not follow its own preventative maintenance standards. So you've got 80% of outages being unplanned. That's an unplanned outage is kind of like having a car break down on the highway instead of having, you know, planning to have a day in the repair shop. So there are plenty of things that are in the record that the court could have noted that the MTA could have done, but it hasn't done. And in terms of a particular standard for New York City, you've got to look at the totality of the circumstances and realize that we're here on a motion for summary judgment. We're not only here on a motion for summary judgment, we're here on defendant's motion for summary judgment. One question if I may, you referred to public transit viewed in its entirety. Are you considering buses? No, your honor. Actually, and I want to be very clear. We refer to these subways, and if I misspoke, I apologize. We're referring to the subway system in its entirety. That is the relevant benefit. That's one area that the district court got right. There's plenty of evidence in the record. But surely the emphasis of all your papers is on the point of people who need to get from A to B. They need to do that for work. They need to do that for school. Why would we not consider that if you have trouble getting there today by elevator because your app tells you that the elevator is at, that that bus may be available? So, your honor, I want to be very clear that we agree with the district court that the appropriate benefit is the subway system. There's plenty of evidence in the record showing how dependent the city of New York is on the subway system. We also want to be very clear, there's plenty of evidence in the records, even if the court were to consider the transportation system on the whole, there's declaration after declaration. There's evidence, including about the failures of paratransit that it requires reserving a day in advance. There's evidence of the buses not going where the folks with disabilities lead them to their destinations in a timely manner. I also wanted to point the court to the requirement in the regs that the MTA in the case of outages, particularly when they've got so many unplanned outages because they're not complying with their own preventative maintenance, they need to have an accommodations program to notify persons with disabilities of an outage so that they can timely be aware. And if they can't plan, they need to provide as an accommodation, alternate transportation, such as shuttle services. There's evidence in the record they're not doing that as well. So, even if we were to consider- I mean, I don't understand that. If the alternative, if you consider looking at all the facts together, that a shuttle service makes sense, why doesn't a bus make sense? The shuttle service, Your Honor, is completely different. It's targeted just towards the outage. And this happens in other cities. This is mentioned, I think, it's in some of the amicus briefing on behalf of the disability community. There are buses, and this happens in the BART system in the Bay Area, that there's specific shuttles that are, once an outage identified, they are targeted at that outage to get people to their destinations based on the outage. It's not the daily bus system, which, as I said, there's plenty of evidence in the record showing at least a disputed material fact that the city buses, in light of the fact that they do not serve the same purposes as the subway, there's plenty of evidence to record that, are not a reasonable substitute. And again, we're here on defendant's motion for summary judgment. There's at least a disputed fact on that issue. When the figure is stated that 8% to 15% of trips are failed trips, my reading of this is that a failed trip includes a five minute delay in restoring elevator service, am I correct? Your Honor, a failed trip means the elevator is unavailable to the person with a disability. There's evidence in the record stating that there's- But for how long? They take on average about three hours. So if you had to pick up your kids from school, like Duncan or Goldenskin, you'd be three hours late. But when you say that the failed trip is up to 15%, my reading of this is that that includes an outage or a closed elevator that's closed for as little as five minutes. Your Honor, again, we're here on summary judgment. There is evidence in the record of the average outages. I believe the average outage is about three hours. Some take as long as 24 hours to clear, so that if you look at the averages, and the idea is you can't rely on this. If you look at our class member, Monica Bartley, she can't rely on the subway system to get to and from work. You don't want to be stuck for three hours with the chance of that happening one out of every five work days. So the question is whether persons with disabilities can rely on the subway system. All that's required if they show a denial of meaningful access, and we're here on defendant summary judgment motion, all that's required here. Can I ask a question about the meaningful access standard? So you said a few times the limited number of stations in New York City that are accessible, but you're not disputing, you're not challenging the determination of the key stations in the New York City subway system and that there should be additional key stations, right? You accept the federal regulation that codifies the consent decree that identifies the key stations in New York City, right? So Your Honor- The baseline of 100 key stations, you're not saying that that's the problem. You're saying within those stations, the accessible features have not been adequately maintained, right? So I want to be very clear, Your Honor, that program access, and this is true under Henrietta Dee, it's true in the context of, particularly when you look at the Foley case, which really talks about these regulations and how program access applies to public transportation, you cannot look at the system in a vacuum. So you're right in the sense that this case is not a specific challenge to the construction requirements for key stations, but at the same time, in case analyzing whether or not there's appropriate maintenance and maintaining accessible features of the elevators in any subway system has to look at the totality of the circumstances and has to understand- Actually, that if the Department of Transportation hadn't promulgated, what is it, 49 CFR 3753 that identifies the key stations for New York City, if there were more stations that were accessible, then maybe New York City would be allowed to be more lax in its maintenance of the elevators, but because there is a smaller number of accessible stations the threshold becomes higher for maintenance? Your Honor, it's a factor that needs to be considered and if you look at some of the other cases involving maintenance of accessible facilities at subway stations, even where they're, like, for example, in the Cupola case, even where there was 100% accessibility, the so-called uptime rate was higher there than it is here. Right, well, so anyway, I'm just, so there is this regulation that talks about the number of key stations, but then there's a separate regulation that talks about maintenance of the accessible features and so that regulation says accessibility features need to be repaired promptly and when it's out of order, the entity shall take reasonable steps to make the accommodation, which I think you mentioned before. So should we think about this in terms of meaningful access to the system overall or should we think about it in terms of whether the city is repairing accessibility features promptly and taking reasonable steps to accommodate when something's out of order? Your Honor, the regulations themselves apply to program accessibility, so when you look at the system in its entirety, whether it's readily accessible, those transportation regulations fall under the general program access requirements. The regulations make clear that you have to look at the unique facts of a particular transportation service site. That's exactly what the Foley case, which fits with the case, but it addresses this exact issue in terms of program accessibility and so you can't operate in a vacuum. You have to look at the unique facts of the system as a whole and to be very clear, Your Honor, because there is less accessibility, woefully low levels of accessibility in New York City, there may be a higher standard of fine. Right, well, I think you also had an argument in your briefs that the city was violating even the maintenance of accessible features regulation, right, so what is the evidence that they're not, the elevators are not being repaired promptly? Well, Your Honor, if you look at their own maintenance plan, and this is stuff that's from the Comptroller as well as from the MTA's own expert, they're not, they're only complying, so only one-fifth of elevators audited or surveyed received preventative maintenance as required and then one of the key factors is the unplanned outages. Again, that's like, rather than making sure that elevators are offline during planned preventative maintenance at night or during off hours, 80% of them are unplanned, so they can occur during rush hour, so those are things that are identified that in fact, they are a need because the MTA has identified them as a need, they're just not complying with their own plans. That's evidence on its own that there's at least a dispute or fact as to whether or not it's up to the city to maintain it. Is there evidence that suggests that the city is, that the outage rates for elevators that are relied on by people who are not disabled are lower than the outage rates for those elevators that are relied on by people who are disabled because if the maintenance is similar across the system, then maybe there's comparable access, maybe that New York City is just bad at maintaining elevators, is that possible? I'm having trouble understanding the question. Are you saying that there's- I'm saying you're giving me statistics about uptime and so on, but do we have evidence in the record to show that the city, that the uptime numbers are worse for accessibility for people who are disabled than for people who are able-bodied? I guess maybe the answer is there isn't a comparable metric because stairs don't get harmed, but I guess you did have some evidence about accessibility versus non-accessibility elevators, right, so could you show that the city is not maintaining the elevators on which people who are disabled rely, but they are maintaining elevators for other access and then that shows a kind of discriminatory- Yeah, I don't think you have to parse necessarily between the fact that elevators are not maintained in accordance with the city's own maintenance in a, like I said, one-fifth, there's evidence from the comptroller that only one-fifth of elevators receive scheduled preventative maintenance and then again, as I mentioned, 80% of outages are unplanned. The difference is between folks who rely on elevators and those who don't. You were correct to point out that, you know, persons who don't rely on elevators can take stairs or other means. The discrimination happening here, and again, I want to remind the court we're on defendant's motion for summary judgment, so all we have to show is a dispute of fact. The discrimination is happening against people who rely on elevators as opposed to stairs. And that requires them to act to repair the elevators at a certain amount, so there isn't a way to distinguish because, you know, stairs don't go down the way elevators do, and so it's hard to say that they are acting to maintain elevators to a lesser extent than the stairs. The evidence, Your Honor, is that they're acting to maintain elevators in a manner that is not providing legal access. Right, okay. Mr. Seaborne, this is Judge Cabranes. I have a somewhat simple procedural question, which is what exactly do you want from us? What's the decree that you would have this court enter? You want us to vacate the judgment to the defendants, is that right? Yes, Your Honor, we want you to vacate the judgment to reverse and remand to the district court. The court could address these issues in terms of where it falls, where that line falls for legal access. Hold on, hold on. So there's no question, you're not asking us to direct the entry of judgment for you. You want us to vacate the judgment, and then to do what? What is it that the district court will do  Well, the district court will consider at trial evidence from the plaintiffs, the experts, both about the level of access. To show what exactly? What exactly do you intend to prove in the district court if we remand this matter? That is, where is that trial? What is that trial going to look like? In aid of what? In aid of what effect? Your Honor, there'll be two I will mean full access under the program access requirements of ADA and section 504. So essentially showing that the evidence in the record shows that there is not with the system as is, and with the maintenance program as is, there's not meaningful access provided to persons with disabilities to the subway system. The second piece is what remedial plan and what remedy could be put in place, what changes could be made to maintenance of the system, to notifying people with disabilities of outage when they occur, to making sure that outages are planned as opposed to non-planned. Hold on a second, Mr. Seaborn. Please hold on a second, just slow down. Is this case going to be tried to the bench or to a jury? This will be a bench trial, Your Honor. Bench trial, all right. And so you want a trial on all of these issues. And at the end of the day, you're seeking injunctive relief, is that right? That's correct, Your Honor. Similar to several cases that have passed through this circuit, including the case that Your Honor was on, the disabled of action case, where there, one, there is a finding of liability on meaningful access under the ADA. Then there could be either a separate hearing on remedy or in the context of the same trial, a discussion of remedy and a remedial plan could be provided. In most cases, once there's a finding of liability, the parties in the cases we've been involved in, including in the disabled in action case, were able to discuss remedies beforehand. And in the nature of things, if you prevail before the district court, what you envisage is that some sort of injunctive order, which would have a life of its own for some period of time, right? This is a very large system. It's a very large system. It's complicated. So the end result of your efforts would be to have the district court supervise the transit system of the subway system of New York City for what is basically an indefinite period of time, right? Your Honor, that's not correct. I respectfully disagree. This will be a much more kind of streamlined or straightforward remedy. What we're envisioning is a remedial plan that will be vetted by experts that involves just a few things. So making sure that the subway system complies with its own preventative maintenance. There could be a monitor that does that, takes it out of the hands of the courts. It could be a third-party expert. Again, pointing to the disabled in action case, there was a third-party expert brought in at the remedy stage. So the court was not, and the key is the court is not intervening in the day-to-day aspects of the running of the MTA. That's simply not something that plaintiffs are asking for, but there are specific things. And we deal with these kinds of injunctions all the time. We have a consent decree now where the parties are working with a third-party monitor on maintenance and alteration of the New York City's sidewalk system, looking at thousands and thousands of curb ramps and intersections throughout the city. Yet it's not an intrusive entry into the day-to-day operations. So this happens with some frequency in the context of the injunctions. But can I ask, if we think that under the circumstances now the city is not providing meaningful access and then you engage in this remedial process, how would we know when meaningful access is restored? What's the mechanism? Your Honor, in a remedial plan of this nature, there can be milestones that once compliance with those milestones is met, then the injunction would be removed. And that happens, again, quite frequently in the context of these- Right, but do you have a position on what those milestones should be? So, Your Honor, again, we are here on defendant's motion for summary judgment. I understand, but you grant summary judgment when there's no material dispute of fact, and the district court seemed to think that there was meaningful access. And so you're telling me that the current condition of the subway is not meaningful access, and I'm just asking how one would know when there is. Your Honor, this would be, again, as I mentioned, the subject of compliance milestones in the context of working with the parties. And in most of these cases, the public entity has a role in determining what those milestones are. And again, I'd like to point out the fact that much of the evidence in the record points to things the MTA has already identified as needs. So whether it's preventative maintenance, whether it's contracting with additional maintainers, all of those things are pieces the MTA itself has identified as needs. The MTA has not said that its preventative maintenance plan is required by the ADA, right? So I'm just asking if we engage in this effort  when would we know that it's compliant with the ADA? Your Honor, there are a variety of factors that the court could look at, one of which could be a figure for uptime. And maybe you look at uptime for stations as a whole as opposed to an individual station. Again, these are factors that one could look at the MTA's compliance with its preventative maintenance plan. There could be an assessment of the accommodations program. So what happens when there is an outage and how folks are noticed and provided alternative accommodations in the context of an outage. This has happened before. It's happened, there was a case like this in Boston. This is not that uncommon of a thing for a court to address. And again, it's not interfering with or managing the day-to-day operations of the subway. All right, thank you, Mr. Seaborn. We'll hear from Mr. Lipton. And perhaps Mr. Lipton, at some point in his argument, will address some of the concerns that he's heard expressed by the judges. In particular, perhaps at the threshold, tell us how many consent decrees or injunctive decrees exist today with respect to the operation of the New York City subway system. There may be an answer to that. Maybe it's just speculation. I'm just curious. All right, go ahead, Mr. Lipton. Thank you, your honors. Again, may it please the court. My name is Ira Lipton. I'm an attorney with the firm of Holgain, Newman, Riegel, and Kenney. And we represent the Appalachian Metropolitan Transportation Authority and the New York City Transit Authority. Just, Judge Cabranes, I don't know the answer to the question as to whether or not there are outstanding consent decrees. I do know that they have happened in narrow circumstances from time to time. And when they do, I think that it's because the plaintiffs seized upon some kind of mandatory, clear statutory requirement that would be reflected in a statute or a regulation that was transgressed. And that would distinguish that kind of case from what the plaintiffs are seeking here, which is to get the district court entwined in the management of the elevator or an escalator department, looking at things like maintenance protocols, when to replace elevators and when not to, and making all sorts of judgments as to how to improve maintenance. I do want to come back to the maintenance issue, especially because we believe that the record was not really fairly represented by esteemed counsel. But I want to begin with the issue of the data and the statistics, which I believe the plaintiffs have kind of walked away from. But down below, as you could see from the argument in the record, the judge was pressing for some kind of a standard that would guide the court. Where is the line that would be drawn? And there was a very good reason for the judge to press on that, because the regulations, which I think the plaintiffs kind of gloss over, explicitly contemplate that elevators do go out of service. It's right there in both the DOJ and the DOT regulations. Of course they do. They're elevators. And in that sense, this case is kind of unique and a little bit different than perhaps other kind of access cases. This is interesting, because I think your adversary is putting things on an extremely broad level, and I think you are too. You're saying elevators go out of service. Of course they go out of service. The questions that are being presented, it seems to me, by your adversary is whether preventive maintenance is conducted on off hours so that elevators don't go out of service during rush hours, whether people get a reliable warning so that they don't go to a station that does not have a working elevator by the prompt input to an app to tell people, don't bother going to that station because the elevator is out, and whether that app can also tell people what their alternatives are so they can get to work. I think this is not just a matter of having elevators that are infallible. This is a matter of having a system so that the elevators serve the people who must depend upon them. And the record is replete with evidence of what the MTA and the transfer authority does in those instances where the elevators do go out of service. And I'm going to address that, but I do want to state that the data on the elevators actually shows that they don't go out of service very much. And that's why, one of the reasons why Judge Daniels, I think, was pressing on where this line was. The median availability from the, which is reported in the decision below, if you look at the median and you look at the hours of most common use during the business day and into the evening hours was 98.7%, and for taking the elevators out for preventive purposes, that already takes it out 1%. So that's 98.7% compared to about, you can't do better than 99%. The mean, yes, is a little lower. So I'll answer your question, but I'm coming back to the data. The data showed that the elevators actually perform reasonably well, but imperfectly, just as the regulations contemplated. Now, what happens- The answer you just gave suggests that the preventive maintenance is done during the business day and in the early evening. No, the preventive maintenance is done, it's a 24-7 system, except for the COVID period, and it's back to 24-7 now. So the planned preventive maintenance is largely done in the evening, but that counts in the elevator availability statistics. So, and that makes New York a little unique compared to other cities, where when they take the system down, there's no passengers, and that doesn't count for availability at all. It does in the New York City Transit Authority system. So they try to do that at night because there's less use at night, and it's less likely to impact people. So- So should we view the system, that the relevant system, as a subway system alone, or connected to, I don't know, the bus system and other things, that often in other cities are operated by other kinds of companies? Right, well, and plaintiffs are correct in that a court should focus on the unique circumstances of a system, and we view this system as more than just subways. First of all, as a subway, it has over 100 ADA-accessible stations. If there's a problem with one, that doesn't mean that there can't be a rerouting through a different, perhaps more securitous route, and less than ideal, but it does offer the possibility for a disabled person to get from point A to point B, even if an elevator is out. We also think that buses are absolutely part of the system, and under the public authority- Sorry. Excuse me, Jack. People have to know the elevator is out in order to decide that instead, they're gonna take the bus. Because you can go down one level with one elevator and encounter another elevator that isn't working, and that can eat up half an hour or three quarters of an hour of your commuting time. So the question becomes, at least in my mind, how does this app work, and is this app effective, and why shouldn't the plaintiffs have an opportunity to show that often it takes three quarters of an hour to advise the public, disabled or not, that a given elevator is out of service? Well, there are a lot of different means of communicating that piece of information. There are apps and alert systems. In fact, at least one of the name plaintiffs, Mr. Pangolinan, used it to research information as to elevator unavailability, and he would plan his ride accordingly. So it certainly works for a lot of people. There's an alert system, you can have an app. There's also a website that you can go on and get a so-called dashboard. There's a program called MTA Trip Planner, which one of plaintiff's experts used, which also gives real-time information about the availability of an elevator. So that's all technology, and sure, I mean, we would understand that maybe some people aren't that facile with technology, but as it happens at a station, there is permanent, sorry. Counselor, let's assume everybody is more facile with this than I am, but you said real-time, and my impression is, I mean, some of the statistics and data and affidavits suggest that it's not real-time, and in order for it to be useful, it has to be very close to real-time, because if it's like 15 minutes off, you've already destroyed somebody's commute for the day. Well, what's the evidence that, I mean, is there evidence that there is or is not a problem with entering real-time information about the availability or the outage of elevators? The evidence is that it takes, there would be a lag of some number of minutes. The evidence was about 13 minutes from the moment that the outage is reported to the moment it's posted. So it's not instantaneous, but so, I mean, there's no getting around the fact that if it happens suddenly and somebody is right there at that elevator, then they're not gonna be able to have gotten advance notice of that, in which case, one would go to a plan B. Then what would that person do? So now there are signs up at every elevator that are permanent signs that have rerouting information, in addition to having a, sorry. You have a minute left. In addition to having a helpline and also a 511 number, and there are also station attendants to help somebody navigate. I mean, this is what happens when, I mean, there are unplanned outages and there's gonna be, there are- Counsel, I have a different question, which is, you just said a moment ago, you were citing these statistics about the percentage of uptimes at 98.7%. The plaintiffs had this expert testimony that said, conducting a study from the perspective of a disabled commuter, they would encounter failed trips a certain percentage of the time, or down elevators a certain percentage of the time. And that's an interesting debate over the fact and what the legal standard should be for meaningful access. But isn't it right that the district court didn't engage with any of that evidence? The district court just said, I'm gonna put all the expert testimony aside and just say, because the ADA doesn't articulate a clear rule, I'm gonna grant summary judgment. Shouldn't the district court have engaged with the conflicting expert testimony? I don't think that, I think the district court was correct in disregarding the expert reports. And he may not have elaborated upon what was wrong with those reports. It's all briefed out. And so he didn't address it and it didn't impact. But I think that the result is right that there was no reason for Mr. Schwartz's report to affect the outcome of this case, because all he did was look at MTA Trip Planner. And if there was an elevator out on the first itinerary, because Trip Planner gives you a variety of itineraries. This is really goes to the core of what's wrong with Plaintiff's case. If one elevator is out, they will not consider whether or not there were other ways of getting to where you needed to go. But that's actually complicated too, right? Because if somebody intended to do the first route on Trip Planner, maybe they could take an alternative route, but they wouldn't know they needed to do that unless they got adequate notice that the elevator was down. And so maybe that leads to a question as to whether there's adequate notice. I mean, shouldn't the district court have engaged with that? I mean, why is the district court's decision saying, well, the ADA doesn't articulate specific means of compliance? Why does that justify summary judgment when you had this evidence on both sides about how to view the issue and what the facts were? Well, because I think the material facts are not in dispute. It goes back to the fact that the elevators are working almost all the time. And when they're out, there are alternative means of getting to where you have to go, including the largest bus system in the United States with over 3,500 ADA accessible buses, 16,000 bus stops. And that's not- Yeah, but you're relying on that now, but the district court actually rejected this idea that the bus system was the reasonable steps that the city could take to provide alternative means, right? I mean, he doesn't mention it in his summary judgment opinion. And so he doesn't even rely on it there, but he had an earlier decision where he said that he was fighting against you on that, right? So isn't that a factual dispute too, whether the bus system is the alternative means? I don't think that it's a fact dispute. And actually, he didn't reject it, he questioned it. And he said that it is not an accommodation in the classical sense is what the judge said. But I think that where there's an area where we disagree with the district judge, it was not because he characterized it as disabled people can always take the bus as if they don't need the subway, they can take the bus. That wasn't it. This is just on those occasions where there's a temporary outage of the elevator. So if one wants to travel a particular route by subway, but they're blocked because of the elevator, just on that occasion, there is a bus stop, if it's at an ADA state, there's a bus stop that's right outside. And that doesn't include other alternative ways of getting there. If it's at a station complex, there are other routes and that there are other elevators so that one can continue on its way. These are really not facts that are in dispute. There's a system in place, which there's a very clear record of and a court could conclude. I mean, you're saying that on the facts or the plaintiffs agree with you that there always is a bus station that is adequately located in proximity to the subway station, such that it's a reasonable accommodation for when the elevators are out? You're saying that there's agreement on that fact? Well, on the fact, they didn't dispute the fact of the bus, of the bus stop. They didn't dispute the existence of the bus system. I understand that, but they did dispute as to whether it provided an adequate accommodation when the elevators aren't working, right? Well, in the sense, it's sort of a legal conclusion. They dispute it in that sense because they're saying that that's not reasonable. They don't say why. I understand it's a legal dispute over whether it's a reasonable accommodation, but part of that is a factual dispute over whether it's in proximity. I mean, you just said a moment ago that there's a bus station located in close proximity to the subway stations when the elevators go out, but that is a factual question that the district court did not resolve, right? It was not disputed by plaintiffs and the district court didn't address it. The district court thought that it was not necessary based upon its conclusion that the plaintiffs hadn't gotten that far in this case because they hadn't established any kind of a standard for the court to hang its head on, relying just on anecdotes. Can I ask you about that? So I was asking, opposing counsel that, about the district court's interest in articulating a standard. Do you have a way to articulate the standard so we would know that above that standard there's meaningful access and below it there is not? Well, there is. It's a good question, Your Honor. There is no standard. And so we, but our view is that it's their burden to show what that standard should be. And look, I would say, I don't think I'd be giving too much away to say- Wait, wait, wait. I'm sorry, I'm sorry. You just said there is no standard, but it's the other side's burden to show the standard. But if you're saying that there is no standard, then how could they have that burden? I mean, aren't you then just agreeing with the plaintiffs that there's no standard and so the district court was obliged  whether there was meaningful access? Well, look, I mean, we could set a standard but what we are saying is that the performance of the elevators on this record would satisfy that standard because the elevators are available almost all the time. And I would like to address what's wrong with the Schwartz analysis in that regard because if the elevators are available 99% of the time, which is almost all of the time, but if you ride them enough, then you're likely to encounter an interrupted trip, not a failed trip, as Mr. Schwartz says, but an interrupted trip. But we're saying that that doesn't state a claim under the ADA. If on an occasion you encounter an elevator out of service, the question from there onto the regs is, is there a program for promptly repairing it? And there is. The median repair time is an hour. The average is about three hours and 95% is repaired within one day. And so then what happens is that the mere fact that you encounter an interruption in that service, when there are alternatives on a temporary basis to get you to where you've got to go, our position is, we think the judge is right, is that that satisfies the requirement that the plaintiffs really haven't stated a claim by merely saying that it's not good enough and you can go from what? A median of 98.7% on a 24-7 basis, excuse me, on a regular business day basis or a 99% station availability. You can do better in theory. You can always do better in that. And that was, I think, part of the judge's frustration. How much better is better? When does it become good enough? The alternatives, of course they don't agree that a bus is a temporary alternative. They complain that the buses are slow. I mean, that might be a better case if the elevators were out 100% of the time and the defense was, well, you can take the bus. But that's kind of a strong end. That's really not really what our position is. We're saying that the elevators are available almost all of the time. It will result in an occasional interruption. And then there are alternatives, whether through rerouting, through using a different station, if you haven't entered the station yet. Mr. Pangilinan, in fact, has a couple of different stations he can walk to or if you're depending on where in the city you are. So, you know, yeah. I think that's just the grounds. I'm delighted by the argument so far, but we're running out of time. Mr. Seaborn has reserved three minutes and I'd like to have him get up and do his thing. Okay. Can I just make, thank you for your indulgences. Can I just make one point regarding the controller's report, which is their evidence that the preventive maintenance program is inadequate. If we check the record, all the controller said is that on the checklist from inspectors, that they weren't always filled out. But that very same report said that the preventive maintenance happens 88% of the time for each elevator on schedule. So I think that the plaintiffs are a little fast and loose with the maintenance program. Thank you for your indulgence. Mr. Lipton, every member of this panel grew up in New York. We know that there's never, if you find a controller's report that does not find a problem, you must let us know. That's what it means to be a controller's report if you live in New York and understand New York. But thank you very much, Mr. Lipton. Mr. Seaborn, this is your big chance. Thank you, your honor. Well, I wanted to direct the court's attention to a few things that were mentioned by my colleague. And all of them are essentially issues of disputed facts. So if you look at his critique of the Schwartz report and attempts to show that there's an additional, a higher level of uptime, for example, he uses the median. And again, this is a dispute between experts. Plaintiff's experts have shown that the median is actually not the appropriate figure to use. The mean is the appropriate figure to use. And again, as plaintiff's experts have shown, when you look at the elevator use and how many elevators required by station, the numbers go down. You're looking at around, going from 96.5 down to around 75%. So that's at least one failed trip per week. And I only raised this to say that these are, again, these are disputed facts. In the context of defendant's motion for summary judgment, these things are facts the court did not consider because it didn't consider the expert reports. Same thing with the facts around the bus system. There's declaration after declaration in the record of the failures of the bus system. Can I just ask, I mean, you're making an argument about the way the facts should be seen, that they're saying that the uptime is a certain level. And you're saying, well, because trips involve multiple elevators, it actually is a greater percentage of than the initial figure suggests that commuters encounter inoperable elevators. Is there a disagreement as to what the actual uptime rate of elevators is? Your Honor, there is disagreement among the experts. And, but again, even if this 96.5 number is taken, it's completely the wrong metric. And I do want to point the court to the CUPOLA, every case that's addressed this issue, the CUPOLA case, which found a denial of program access based on 97% uptime where there was complete accessibility. In the Marta case, there was 99% uptime. So the fact that defendants have kind of glommed onto this 96.5, again, that it's when it's not the appropriate metric when you consider that the average commute, again, you have to look at the statistics and the district court did not. The average commuter requires four to eight elevators in addition to two elevators per station, the average commuter requires four to eight elevators per trip. That's why the experts and the plaintiff's sides looked at trip data and what it actually means in that context, particularly given how important the subway system is to commuters. But I just raised those to denote that these are disputed facts that the court, in its air of not looking at anything else besides whether or not there was a particular uptime standard and I think defendants are right. There is no particular uptime standard. That's the air and because of that, it didn't consider all these disputed facts. Even the facts around maintenance that you heard defendants mentioning, that those plaintiffs dispute those facts. There isn't an appropriate notice system, the list net system that they use for tracking and noticing. I'm sorry. I think we've heard this argument. It sounds vaguely familiar. It's okay. You've made that point and we're pleased to have it, but I think you can just wrap it up now. I just want to remind the court, Your Honor, that we're here on defendant's motion for assembly judgment given the unique nature of the subway system, the woeful level of accessibility, the expert testimony. Mr. Seaborn, please calm down. That's the first thing you have to do is calm down. Go slowly. You've told us this many times, Mr. Seaborn. We appreciate it. Do not misunderstand my impatience, but we have heard it. I think we have heard it and we will reserve decision in this case. Thank you very much. And I'll ask the clerk to close court. Thank you. Thank you, Your Honor. Thank you, Your Honor.